UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
                                       :

ICICI BANK UK PLC,                  :        Case No.

                       Plaintiff,      :

                - against -      :        **COMPLAINT**

CARGILL, INCORPORATED and CARGILL  :
FINANCIAL SERVICES INTERNATIONAL, INC.,  :

               Defendants.    :

----------------------------------------------------------------X

      Plaintiff ICICI Bank UK plc (the "Bank") by its attorneys, Sullivan & Worcester LLP,

for its complaint avers as follows:

      1.      Through this action the Bank seeks, among other things, to enforce its contractual

right to rescind its purchase of three accounts receivable ("A/Rs") from Defendants.  The Bank

purchased each A/R based on, among other things, Defendants' representation and warranty that

each arose from a bona fide sale of specific goods from Defendants to a specific counterparty.

As recently revealed, however,

      a.      the A/Rs did not arise from bona fide sales transactions, but instead were

            used by Defendants to disguise loans they or affiliated companies made to

            non party Mercator Lines (Singapore) Limited ("Mercator"); and

      b.      Even if sales actually occurred (which most definitely is not the case),

            those transactions are materially different from that which Defendants

            represented.

2.      Mercator is now in the midst of "restructuring" its financial obligations.  It has defaulted on the first two maturing A/Rs.  Defendants have accelerated repayment on the third A/R.

Parties

3.      The Bank is incorporated under the laws of England and Wales. Its principal place of business is at One Thomas More Square, London, England E1W 1YN.

4.      Upon information and belief, Cargill, Incorporated ("Cargill Inc.") is incorporated under the laws of Delaware and maintains its principal place of business at 100 South Fifth Street, Suite 1075, Minneapolis, Minnesota 55402.

5.      Upon information and belief, Cargill Financial Services International, Inc. ("CFSI" and collectively with Cargill Inc. and other affiliates, "Cargill") is incorporated under the laws of Delaware and maintains its principal place of business at 100 South Fifth Street, Suite 1075, Minneapolis, Minnesota 55402.

6.      Upon information and belief, non party The Receivables Exchange, LLC ("TRE") is a limited liability company organized under the laws of Louisiana with its principal place of business at 100 Park Avenue, 30th floor, New York, New York 10017.  Upon information and belief, TRE acts as a clearing house for the purchase and sale of accounts receivable.

7.      Upon information and belief, non party Mercator is incorporated under the laws of Singapore and maintains its principal place of business at No. 8 Temasek Boulevard, Suite 07-02, Suntec Tower 3, Singapore 038988.

Jurisdiction and Venue

8.      The amount in controversy exceeds $75,000, exclusive of interests and costs. The

Court, therefore, has jurisdiction over the subject matter of this dispute pursuant to 28 U.S.C.

§ 1332(a)(2), based on diversity of citizenship.

9.      The Court has personal jurisdiction over each of Defendants based on

Defendants' written consent.  Personal jurisdiction is also based on New York's long-arm

statute, N.Y.C.P.L.R.  302  (McKinney 2010).

10.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), as agreed by

the parties, and because a substantial part of the events or omissions giving rise to the claims

alleged herein occurred in this District.

Facts Common To All Claims

11.      This action concerns transactions facilitated through TRE.  TRE describes its

business as follows:

> Receivables Exchange ["RecX"] is the leading electronic exchange
> for the sale and purchase of accounts receivable. In association
> with NYSE, RecX connects large corporate sellers of receivables
> with diversified sources of liquidity, including banks, family
> offices and asset management funds.  Transactions over RecX are
> structured to result in a "true sale" of the receivables, thus offering
> balance sheet benefits to sellers and attractive risk-adjusted returns
> to buyers.

http://recx.com/about-the-company (viewed July 6, 2015).

12.      From the perspective of a potential purchaser of accounts receivable such as the

Bank, TRE operates as an internet-accessed intermediary, essentially a broker for a disclosed

principal (*i.e.*, the "large corporate sellers of receivables").  Via TRE, a "member," *i.e.*, a potential buyer, views a thumbnail description of available accounts receivable.

13.     Sales through TRE are styled as auctions; and members are permitted to submit "bids" throughout the period a receivable is available for sale.  A successful bidder is the member who offers to buy the receivable at the smallest discount from face value.  Underlying documentation, such as invoices, bills of lading, contracts, etc., are not made available to members at the time of auction.

14.     On or about November 8, 2012, Defendants and TRE executed a document entitled: "Corporate Seller Program Agreement Effective as of November 8, 2012 By and Between Cargill, Incorporated, Cargill Financial Services International, Inc. and The Receivables Exchange, LLC with All Buyers of Trade Receivables Over the Receivables Exchange Being Third-Party Beneficiaries."  That agreement together with its Exhibits 1 and 2 ("Definitions and Rules of Construction" and "Rules and Procedures") constitute the "Seller Agreement."  A copy of the Seller Agreement is attached hereto as Exhibit A.

15.     The Seller Agreement provides that any party who buys receivables from Defendants is a "third-party beneficiary" of the Seller Agreement.

16.     The Seller Agreement limits the type of receivables that sellers, such as Defendants, are permitted to sell via TRE:  those receivables must relate to actual, unconditional sales of goods or services by the Seller.  In essence, TRE is restricted to receivables that reflect a Seller's sale, and the account debtor's purchase, of goods and services.

17.     To this end, the Seller Agreement provides that "Receivable means Seller's accounts, contracts rights, [etc.] and all other form of payment obligations originally owing to Seller, in each case arising out of the sale of goods or the rendering of services by Seller." Exhibit 1 to Seller Agreement.

18.     Further, the Seller Agreement sets forth the Seller's express representation and warranty that, inter alia, any receivable they sold via TRE:

a.     arose from a "bona fide, arm's length sale of goods or services in the ordinary course of the Seller's business" (Seller Agreement § 10.1.5); and

b.     is governed by a Sales Contract between the Account Debtor and Seller and is subject to the general terms and conditions that apply to sales of goods and furnishing of services by Seller to its customers" (Seller Agreement § 10.1.7).

19.     On or about May 28, 2014, the Bank and TRE executed a form of agreement provided by TRE entitled "Corporate Receivables Buyer Agreement" (the "Buyer Agreement"). A copy of the Buyer Agreement is attached hereto as Exhibit B.

20.     The Buyer Agreement makes repeated reference to "Seller Program Agreements," *i.e.*, agreements between TRE and sellers of accounts receivable of which the Seller Agreement is an example. For example, the Buyer Agreement provides:

**2.5 Seller Program Agreement**. Each Receivable Interest purchased under a Seller Program shall be governed by the terms of the Seller Program Agreement applicable to such Seller Program....

21.     Beginning in June 2014, the Bank began to consider purchasing receivables from Cargill Inc. / CFSI through TRE and in particular receivables owed to Cargill / CFSI by Mercator.

- 5 -

22.     In connection with that effort, at the same time, TRE made a copy of the Seller

Agreement available to the Bank.

23.     At or around  the same time, TRE also made available to the Bank a document

entitled "Program Summary  Cargill Program Overview " (the "Cargill Program Summary").  In

its entirety, the Cargill Program Summary provides:

> The Sellers under the Cargill Program are Cargill, Incorporated and
> Cargill Financial Services International, Inc., wholly owned subsidiary of
> Cargill, Incorporated.  The Receivables to be sold by each Seller under the
> Program are Receivables originated by such Seller.  Neither Seller has any
> liability with respect to Receivables sold by the other Seller.
>
> This summary overview of the Cargill Program is qualified in its entirety
> by the applicable terms of the Seller Agreement and other documents
> posted in the Legal Documents section.  Buyers should be familiar with
> the terms of such documents before they submit any bids to purchase
> Receivables under the Program.

A copy of the Cargill Program Summary is attached as Exhibit C.

24.     On or around the same time TRE made available a "Cargill Informational Memo -

Mercator" (the "Info Mem").  Among other things, the Info Mem identified Mercator as the

"Obligor," i.e., the account debtor, and the "good (sic)/service provided" as "Bunker Fuel for

Ships."  A copy of the Info Mem is attached as Exhibit D.

25.     Upon information and belief, Defendants wrote or authorized the Cargill Program

Summary and Info Mem intending that TRE would make copies available to potential bidders of

Defendants' receivables, including the A/Rs.

26.     The information provided through TRE via the thumbnail descriptions, the Cargill

Program Summary, and the Info Mem, allowed the Bank to answer a series of critical questions,

including:  Is the seller an acceptable counterparty; is the account debtor an acceptable credit

risk; is the underlying trade a transaction more or less likely to be repaid; does the transaction as described have any risk mitigants?

27.     Beginning in or about October 2014, having reviewed the Seller Agreement, the Cargill Program Summary, and the Info Mem and in reliance thereon, the Bank purchased the A/Rs in dispute through three distinct TRE-organized auctions.  Each A/R ostensibly represented the sale of goods by Defendants to Mercator.

28.     The Bank purchased the A/Rs based on the information made available by Defendants via TRE, the essential elements of which are set forth in the chart below.

| Consummation/ Funding Date | TRE Auction # | Declared Seller according to TRE | Account Debtor | Product according to TRE | Face Value | Maturity |
|---|---|---|---|---|---|---|
| December 30, 2014 | 30530 | Cargill Inc/CFSI | Mercator | Bunker fuel for ships | $3,499,999,48 | April, 2015 |
| October 31, 2014 | 30410 | Cargill Inc/CFSI | Mercator | Bunker fuel for ships | $1,500,093.34 | April, 2015 |
| April 10, 2015 | 30711 | Cargill Inc/CFSI | Mercator | Bunker fuel for ships | $3,999,999.81 | September, 2015 |

29.     The Bank purchased all three A/Rs and remitted the required payment to TRE, in aggregate, $8,854,120.80.  For auction no. 30530 the net payable to TRE was $3,455,430.82; for auction no. 30410 the net payable to TRE was $1,471,760.74; and for auction no. 30711 the net payable to TRE was $3,926,929.24.  Upon information and belief, TRE remitted these funds, less its charges and fees, to Defendants.

30.     Towards the end of April 2015, Mercator, citing difficulties facing the dry bulk shipping market, appointed a financial advisor "to assist with an assessment of its financial position and to advise and assist, as appropriate, with the options available to the company with respect to its financial affairs."  http://www.seatrade-maritime.com/news/asia/mercator-lines-singapore-appoints-financial-advisor-as-dry-bulk-market-takes-its-toll.html (viewed July 6, 2015).

31.     Subsequently, Mercator failed to pay the first two maturing A/Rs.  Upon information and belief, Mercator is currently proposing to reschedule much of its debt, including that which is represented by the A/Rs.

32.     On April 22, 2015, following Mercator's failure to pay the first maturing A/R, the Bank requested that TRE obtain and forward documentation respecting the commercial activity that ostensibly underlay the A/Rs.  In short order, TRE provided disturbing information.

33.     The documentation was a mishmash.  Invoice numbers provided at the time of auction did not match those of the "actual" invoices; and the produced documentation described products that were fundamentally different from the products Defendants' described via TRE through the Info Mem. Thus rather than reflect the sale and purchase of bunker fuel, the underlying documentation concerned "naphtha" and "gasoil."

34.     More disturbing still, Defendants later revealed that the A/Rs did not relate to any actual sales to Mercator.  Indeed the A/Rs did not relate to bona fide sales by any party.  Instead, the A/Rs were a front for a financing, a loan or loans made by some component of Cargill to Mercator.

35.     In brief, affiliates of Defendants—but not either Defendant—notionally sold products to Mercator with deferred payment terms.  Mercator's purchase, however, was conditioned on its simultaneous sale back to Defendants or other members of the Cargill group. Defendants in turn provided the funds with which to pay the original notional sellers, i.e., Defendants' affiliates.  Mercator, therefore, was doing little more than borrowing cash from one Cargill entity with a promise to repay another in the future.  The goods were never sold to Mercator.  Nothing was delivered to Mercator.  Indeed, bills of lading were never endorsed to Mercator.

36.     Contrary to its representations, therefore, the A/Rs that Defendants engineered (and that the Bank purchased) did not arise from a bona fide sale of goods.

37.     In sum in the last thirty days, the Bank has learned of fundamental differences between that which Defendants offered for sale via TRE and that which Defendants actually sold.  Those differences are summarized in the following chart, which shows that contrary to the representations and warranties implicit to their posting with TRE and explicit by the terms of the Seller Agreement, Defendants did not sell, much less deliver, bunker fuel to Mercator.

| TRE Auction # | Seller according to information defendants provided on TRE website at time of auction | Seller according to documents provided in May/June 2015 | Product according to information defendants provided in Info Mem via TRE at the time of initiating business with Cargill | "True" Product according to documents provided in May/June 2015 | Invoice # according to information defendants provided on TRE website at time of auction | Invoice # according to information defendants provided in May/June 2015 |
|---|---|---|---|---|---|---|
| 30530 | Cargill Inc/CFSI | Invoiced by Cargill Financial Solutions, LLC to Mercator<br><br>Bill of lading indorsed by Cargill, Incorporated to Cargill International SA to Statoil ASA | Bunker fuel for ships | Gasoil | 97030 | CFSIL-611-15-S |
| 30410 | Cargill Inc/CFSI | Invoiced to Mercator by Cargill International SA<br><br>Bill of lading indorsed by Cargill International SA to Cargill International Trading Pte Ltd. | Bunker fuel for ships | Naphtha | 95011 | 14000043 |

| TRE Auction # | Seller according to information defendants provided on TRE website at time of auction | Seller according to documents provided in May/June 2015 | Product according to information defendants provided in Info Mem via TRE at the time of initiating business with Cargill | "True" Product according to documents provided in May/June 2015 | Invoice # according to information defendants provided on TRE website at time of auction | Invoice # according to information defendants provided in May/June 2015 |
|---|---|---|---|---|---|---|
| 30711 | Cargill Inc/CFSI | Invoiced by Cargill Financial Solutions, LLC to Mercator<br><br>Bill of lading indorsed by Cargill International SA to Cargill International Trading Pte Ltd. | Bunker fuel for ships | Naphtha | 98911 | CFSIL-696-15-S |

38.     Defendants have caused the Bank to suffer real and continuing damages.  For example, Mercator, apparently experiencing cash flow issues, is proposing to reschedule the debt that it owes to various creditors.  As is often the case, Mercator proposes to provide trade creditors with favorable terms.  But Mercator, fully aware of the actual facts, does not consider the A/Rs to represent trade debt, and proposes for them far less favorable terms.

39.     More to the point, the Bank would not have purchased the A/Rs had Defendants disclosed their true nature.

40.     Based on the foregoing, and as described in more detail below, the Bank, through TRE, demanded that Defendants repurchase the A/Rs.  Defendants have refused.

<u>First Claim for Relief (Breach of Contract)</u>

41.     The Bank repeats and realleges each of the above averments.

42.     Pursuant to Seller Agreement § 8.2.1(i), Defendants "absolutely, unconditionally and irrevocably agrees (sic) to repurchase the" receivables if representations or warranties set out at Seller Agreement § 10.1" are "materially inaccurate or materially incorrect when made."

43.     Pursuant to Seller Agreement § 10.1, at the time of the Bank's purchase, Defendants represented and warranted as to each A/R:

a.      That each was, in fact a Receivable;

b.      That each was owned by one of the Defendants (Seller Agreement § 10.1.2);

c.      That each arose out of a "bona fide, arm's length sale of goods or services in the ordinary course of the Seller's business, and the Account Debtor has accepted the goods and services billed under the related Invoice without condition and without reservations of rights ..."  (Seller Agreement § 10.1.5);

d.      That none resulted from "a conditional sale..." (Seller Agreement § 10.1.6);

e.      That each is governed by a "Sales Contract between the Account Debtor and Seller and is subject to the general terms and conditions that apply to sales of goods and furnishing of services by Seller to its customers" (Seller Agreement § 10.16); and

f.      That to Defendants' knowledge, "Account Debtor Information" that they posted on TRE was "complete and accurate in all material respects" (Seller Agreement § 10.1.12).

44.     Each of the above represented and warranted facts was "inaccurate or incorrect" when made and each constitutes a Repurchase Event under the Seller Agreement.

a. The A/Rs were not in fact Receivables; they did not arise "out of the sale of goods or the rendering of services by the Seller in its ordinary course of business." Indeed, they arose only from the notional, illusory sale of goods from Defendants' affiliates to the account debtor, Mercator, a sale that was extinguished no later than a nanosecond after it was created.

b. The A/Rs were not originated and owned by either Defendant. The A/Rs, to the extent they ever truly existed, were owned by Defendants' affiliates.

c. The A/Rs did not arise from a "bona fide, arm's length sale of goods or services." They arose as part of a loan transaction. They did not arise in the ordinary course of Cargill's business, which presumably involves the sale of commodities, rather than camouflaging loans to troubled shipping companies. The Account Debtor never accepted the goods, either bunker (as described in the Info Mem) or naphtha (as revealed by the just-released documents).

d. The A/Rs arose from a bizarrely conditional sale: as a condition to its notional purchase, the account debtor, Mercator, was required immediately (if not sooner) to "resell" the bunker (or naphtha) back to the Cargill family.

e. The A/Rs were subject to highly unusual conditions, hardly the "general terms and conditions that apply to sales of goods and furnishing of services by Seller to its customers"; and

f. The "Account Debtor Information" was materially incorrect and incomplete. Simply put, the true nature to the transaction that of a loan to Mercator, was concealed.

45. Each "inaccurate" or "incorrect" representation or warranty was material. The Bank would not have invested in receivables that were based on something other than bona fide purchases by an account debtor. That fact alone, had it been disclosed, would have caused the Bank not to purchase the A/Rs.

46. Further, an account debtor who seeks to borrow funds via unconventional means, *i.e.*, via a transaction disguised to appear as something it is not, is inherently different than, for example, a shipping company buying fuel for its ships. Indeed, the latter suggests a going concern, while the former suggests the possibility of something else.

- 13 -

47.     Similarly, the identity of the true seller of goods is material.  Even among
affiliates, not all companies are alike.  Credit decisions depend on the precise identity of specific
counterparties.  Here the ostensible counterparties were Defendants, not unknown affiliates of
Cargill.

48.     A further material difference is illustrated by the treatment Mercator proposes for
the A/Rs in its restructuring.  As noted, Mercator proposes to reschedule the A/Rs not as "trade
debt" (which is a favor status), but instead as something else, doubtless maintaining that the
A/Rs relate not to trade (e.g., the purchase of bunker), but instead to an unsecured loan.

49.     Based on the above, and pursuant to the Seller Agreement § 8.1, the Bank,
through TRE, demanded that Defendants "repurchase" the A/Rs.

50.     Defendants have to date refused to fulfill their repurchase obligations in violation
of the Seller Agreement.

51.     As a result, the Bank has been damaged.

## Second Claim for Relief (Breach of Contract)

52.     The Bank repeats and realleges each of the above averments.

53.     Pursuant to Seller Agreement § 8.2.1(i), Defendants "absolutely, unconditionally
and irrevocably" agreed to repurchase the A/Rs  if  "the Account Debtor fails to pay a
[receivable] in full by the Repurchase Date... unless an Account Debtor Insolvency Event has
occurred on or prior to such Repurchase Date."

54.     The "Repurchase Date" for the first and second maturing A/Rs has passed.

55.     Defendants have failed to repurchase the first two maturing A/Rs despite the passing of the Repurchase Date for each.

56.     By reason of Defendants' acceleration of the third A/R, its Repurchase Date is July 22, 2015.

57.     By reason of its actions to date, Defendants have manifested their intention to breach their "repurchase" obligations with respect to the third A/R, have repudiated their obligations with respect thereto, and are in anticipatory breach thereof.

58.     As a result, the Bank has been damaged in an amount to be determined at trial.

WHEREFORE, ICICI Bank UK plc demands judgment against Defendants as follows:

A.      As to its first claim for relief, rescinding its purchase of the three specified accounts receivables or, alternatively, damages against each Defendant in an amount to be determined by the Court;

B.      As to its second claim for damages against each Defendant in amounts to be determined by the Court;

C.      As to both claims for relief,  interest at the statutory rate provided by the laws of the State of New York, plus costs, and to the extent permitted by law or contract, attorney fees and related legal expenses, as well as such other and further relief as the Court may deem just and proper.

Dated: New York, New York                           SULLIVAN & WORCESTER LLP
       July 10, 2015


                                                    By:/s/Michael T. Sullivan
                                                       Michael T. Sullivan
                                                    1633 Broadway, 32nd Floor
                                                    New York, New York 10019
                                                    (212) 660-3000

                                                    *Attorneys for Plaintiff*

TO:    CARGILL, INCORPORATED
       100 South Fifth Street,
       Suite 1075
       Minneapolis, Minnesota 55402

              and

       CARGILL FINANCIAL SERVICES
       INTERNATIONAL, INC.
       100 South Fifth Street,
       Suite 1075
       Minneapolis, Minnesota 55402