UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
ICICI BANK UK PLC,                                          :    No. 15-5379 (VEC)
                                                            :
                        Plaintiff,                          :
                                                            :    **THIRD-PARTY COMPLAINT**
            vs.                                             :
                                                            :
CARGILL, INCORPORATED and CARGILL                           :
FINANCIAL SERVICES INTERNATIONAL,                           :
INC.,                                                       :
                                                            :
                        Defendants.                         :
                                                            :
-----------------------------------------------------------
                                                            :
CARGILL, INCORPORATED and CARGILL                           :
FINANCIAL SERVICES INTERNATIONAL,                           :
INC.,                                                       :
                                                            :
                        Third-Party Plaintiffs,             :
                                                            :
            vs.                                             :
                                                            :
THE RECEIVABLES EXCHANGE, LLC,                              :
                                                            :
                        Third-Party Defendant.              :
                                                            :
------------------------------------------------------------X

   Defendants and Third-Party Plaintiffs Cargill, Incorporated ("Cargill") and Cargill

Financial Services International, Inc. ("CFSI"), by their attorneys Sidley Austin LLP, for their

Third-Party Complaint against The Receivables Exchange, LLC ("TRE") allege as follows:

<u>**NATURE OF THE THIRD-PARTY ACTION**</u>

   1.  Cargill and CFSI bring this third-party action based on TRE's fraudulent conduct

and its multiple material breaches of contract, which directly have given rise to the underlying

action commenced by Plaintiff ICICI Bank UK plc ("ICICI UK") in connection with its purchase

of certain receivables offered by Cargill and CFSI through TRE.  ICICI UK claims that Cargill and CFSI breached representations and warranties and obligations under a Corporate Seller Program Agreement (as defined below) between TRE, Cargill, and CFSI, to which ICICI UK purports to be a third-party beneficiary.  ICICI UK's allegations have no merit and Defendants deny any liability whatsoever to ICICI UK, however, if Defendants are found to be liable to ICICI UK, then TRE is liable to them, because TRE's fraudulent conduct and breaches of its own contractual duties are the cause of any and all of the purported damages alleged by ICICI UK.

2.      TRE owns, operates, and is solely responsible for administering an electronic auction marketplace for connecting sellers of accounts receivable with potential buyers to purchase the auctioned invoices.  TRE sets the rules for its "Corporate Receivables Program," and enters into a form "Corporate Seller Program Agreement" with aspiring sellers and a form "Corporate Buyer Program Agreement" with potential purchasers.  TRE sets itself up as the sole contact with potential sellers on the one hand, and with potential buyers on the other, and mandates that it alone is responsible for communicating a seller's information regarding offered receivables to potential buyers.  Indeed, under the rules dictated by TRE, sellers are not permitted to communicate at all with or even know the identity of potential buyers, and instead authorize TRE to convey information to potential buyers.

3.      Hungry for more of Defendants' receivables business, TRE strongly encouraged Defendants to offer at auction the three receivables at issue here.  Defendants made full disclosure of the underlying transactions that resulted in those receivables, and asked for confirmation that they would be appropriate for inclusion in TRE's Corporate Receivables Program, to which TRE responded unequivocally: "This is right in the strike zone . . . ."

Thereafter, TRE marketed these receivables to potential buyers, and as alleged in the Complaint, closed the sale of them to ICICI UK, never even identifying the counterparty to Defendants.  In short, TRE set the rules for receivables offered on its electronic exchange, solicited both sides to the transaction and brokered the ultimate sale of the receivables in question.  TRE, not Defendants, must bear any resulting responsibility for any purported claim by Plaintiff, as well as indemnify Defendants for all damages they have incurred or will incur, including the costs of having to defend against Plaintiff's claims.

4.      As described in more detail below, TRE solicited the sale on TRE's electronic exchange of three accounts receivable that non-party Mercator Lines (Singapore) Ltd. ("Mercator") owed to entities within the Cargill Group (the "Mercator Receivables").  In 2014 and 2015, in connection with its role as the intermediary between all sellers and buyers on the TRE exchange, TRE orchestrated and facilitated the sale of the Mercator Receivables by Cargill and CFSI to an unknown buyer, which according the allegations in the Complaint, was Plaintiff ICICI UK, for an aggregate amount of approximately $ 8.85 million.

5.      After the sale, pursuant to the Corporate Seller Program Agreement, the buyer, ICICI UK, took ownership of the Mercator Receivables and was entitled to payment by the account obligor for the undiscounted face value of the Mercator Receivables.  In exchange for this entitlement, ICICI UK specifically contracted to bear the sole credit risk of a customer insolvency event, agreed it had no recourse against Cargill and CFSI, and agreed that Cargill and CFSI were not required to repurchase a defaulted receivable except in very limited scenarios— which have not been triggered with respect to the Mercator Receivables.

6.      Upon information and belief, prior to the April 2015 maturity date of the first two Mercator Receivables, Mercator became insolvent, and did not make the scheduled payments

related to those receivables.  ICICI UK knowingly bore the specific risk that Mercator would experience an insolvency event when it purchased the Mercator Receivables pursuant to the Corporate Seller Program Agreement.  Through this lawsuit, ICICI UK now attempts to avoid the consequences of Mercator's insolvency and demands that Cargill and CFSI repurchase the Mercator Receivables—despite the fact that Cargill and CFSI have no repurchase obligations, and have fulfilled their contractual obligations under the Corporate Seller Program Agreement.

7.      ICICI UK alleges that, during the auction process, Defendants did not disclose the true nature of the Mercator Receivables, thereby breaching certain representations and warranties in the Corporate Seller Program Agreement.  Plaintiff seeks rescission of the underlying sales or damages in the amount of the price it paid to acquire the receivables.

8.      Contrary to Plaintiff's contention, neither Cargill nor CFSI breached any representations and warranties related to the Mercator Receivables, and to the contrary, Cargill and CFSI complied with all disclosure obligations under the Corporate Seller Program Agreement.  Indeed, starting from when TRE and Cargill and CFSI first discussed the possibility of listing the Mercator Receivables on the TRE Platform (as defined below), and repeatedly thereafter, Cargill and CFSI fully disclosed to TRE the series of transactions with Mercator that it would sell on TRE's exchange—*i.e.*, accounts receivable whereby a Cargill entity would sell a commodity to Mercator under a deferred payment agreement, in connection with which another entity within the Cargill group would repurchase the commodity, paying on sight.  To the extent that a party had a duty to speak and to disclose the information about which Plaintiff now complains, that party was TRE, which had a complete understanding of the transactions at issue and had the sole contractual right and ability to communicate such information to potential buyers.

9.      Notwithstanding TRE's full knowledge of the nature of the Mercator Receivables and, upon information and belief, a series of pre-sale communications with ICICI UK regarding those transactions over a period of months, Plaintiff has alleged in the Complaint that TRE did not disclose the nature of the transactions to ICICI UK and wrongly contends that Cargill and CFSI knew of or participated in TRE's omissions and/or misrepresentations. To the extent that the information Plaintiff now contends was pertinent is determined to be relevant by this Court, any failure by TRE to disclose that information to ICICI UK was without Cargill's or CFSI's knowledge or approval, and that failure was either grossly negligent or wrongful insofar as it was designed to conceal the true information from ICICI UK.

10.      Flagrantly disregarding the fact that it was fully aware of the nature of the Mercator Receivables from the outset and its role in enabling Defendants to offer those very receivables for sale, in June 2015, TRE disingenuously demanded that Defendants repurchase the Mercator Receivables from the (then) unnamed buyer because Defendants purportedly had breached representations and warranties concerning their nature.  TRE's faithless and deceptive actions with respect to the Mercator Receivables constitute fraud, multiple material breaches of TRE's contractual obligations under the Corporate Seller Program Agreement, and breach of its duty of good faith and fair dealing underlying that agreement.  As a result of TRE's actions, Cargill and CFSI have been forced to incur legal fees and other expenses in connection with this action and also face claims of approximately $9,000,000 for alleged breach of the Corporate Seller Program Agreement.  By this Third-Party Complaint, if there is any liability to Plaintiff in this action, such liability must be borne by TRE.

## THE PARTIES

11.     Defendant and Third-Party Plaintiff Cargill is incorporated under the laws of Delaware and maintains its principal place of business in Wayzata, Minnesota.  Cargill's business is diversified, and it is the largest privately held corporation in the United States.

12.     Defendant and Third-Party Plaintiff CFSI is incorporated under the laws of Delaware and maintains its principal place of business in Hopkins, Minnesota.  CFSI and its subsidiaries trade money market instruments, public and private sector debt obligations, and equity securities.  CFSI also acts as an agent and facilitates transactions that are primarily financial in nature for affiliates or other third parties.

13.     Upon information and belief, Third-Party Defendant TRE is a limited liability company organized under the laws of Louisiana with its principal place of business in New York, New York.  TRE's website touts the company as "the leading electronic exchange for the sale and purchase of accounts receivable."  (www.recx.com, as of August 16, 2015.)  Upon information and belief, TRE's sole member is The New Orleans Exchange, Inc., a corporation organized under the laws of Delaware and with its principal place of business in New Orleans, Louisiana.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this third-party action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the matter in controversy exceeds $75,000, exclusive of interest and costs.  Alternatively, the Court has jurisdiction over the subject matter of this third-party action pursuant to 28 U.S.C. § 1367 insofar as the Court has original jurisdiction over the subject matter of the main action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship

between the Plaintiff and the Defendants-Third-Party Plaintiffs and the matter in controversy exceeds $75,000, exclusive of interest and costs, and the Court may exercise supplemental jurisdiction over all other claims herein, which are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy.

15.     This Court has personal jurisdiction over Third-Party Defendant based on TRE's written consent because TRE submitted to the jurisdiction of this Court in the Corporate Seller Program Agreement, and because, upon information and belief, TRE's principal place of business is in New York.

16.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Third-Party Defendant TRE's principal place of business is in this judicial district, a substantial part of the events and omissions giving rise to the claims herein occurred in this District, and the parties submitted to venue in this District in the Corporate Seller Program Agreement.

## FACTUAL BACKGROUND

### A.     The TRE Platform

17.     Upon information and belief, TRE owns and operates a web-based electronic marketplace whereby sellers may offer their commercial accounts receivable at auction for sale to buyers on the exchange (the "TRE Platform").  In the Corporate Seller Program Agreement (as defined below), TRE states that it is "the owner and operator of the Receivables Exchange$^{TM}$ over which Registered Sellers may offer for sale and sell business-to-business accounts receivable and other payment obligations to Member Buyers on a competitive live auction basis."  Corporate Seller Program Agreement, at 1.

18.     As part of TRE's accounts receivable auction process, a seller (the business that is owed money by its customer) can place its accounts receivable on TRE's exchange and sell it at a discount to face value in exchange for an immediate payment; the buyer obtains the discounted

right to the full face value of the account receivable at a later date or over a period of time. However, upon information and belief, before a sale is actually posted on the TRE Platform, TRE actively markets the transaction to existing and prospective buyers.  Upon information and belief, in connection with this marketing effort, TRE shares information about the sale with a potential buyer, and will negotiate a price.  Upon information and belief, in order to conclude the trade, and after the buyer and TRE have reached a deal, TRE will ask the seller to post the account receivable to the Platform.  Upon conclusion of the sale, the successful buyer owns the receivable and is legally entitled to collect the account, and the seller retains no ownership rights or interest in the accounts or proceeds thereof.

**B.     The Corporate Seller Program Agreement**

19.     On about November 8, 2012, Defendants and TRE entered into the Corporate Seller Program Agreement, as amended by Amendment No. 1 to the Corporate Seller Program on November 8, 2012 (the "Corporate Seller Program Agreement").

20.     Section 2.1 of the Corporate Seller Program Agreement describes the Corporate Receivables Program in which Defendants participated:

> TRE has established the Corporate Receivables Program in order to provide Seller with liquidity access to an electronic market place (the Exchange) over which Seller may offer Receivables for sale at a discount to Member Buyers.

21.     Section 2.2.1 of the Corporate Seller Program Agreement describes the TRE Platform:

> TRE has established the TRE Platform over which (i) Seller may Post Receivables for sale at discount auction, (ii) Member Buyers may view certain information regarding Posted Receivables and obtain relevant Seller Information, Account Debtor Information, and TRE Work Product Data and (iii) Member Buyers may submit Bids to purchase Receivables.

22.     As defined in Exhibit 1 of the Corporate Seller Program Agreement,

"'Receivable' means Seller's accounts, contract rights, general intangibles, payment intangibles,

chattel paper, instruments, and all other forms of payment obligations originally owing to Seller,

in each case arising out of the sale of goods or the rendering of services by Seller."

23.     Section 16.11 of the Corporate Seller Program Agreement provides that New

York law shall govern:

> THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAWS THEREOF OR OF ANY OTHER JURISDICTION OTHER THAN SECTION 5-1401 AND SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES UNDER THIS AGREEMENT SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

(Capitalization in original.)

24.     Section 16.11.2 of the Corporate Seller Program Agreement provides that any

legal action or proceeding shall be brought in this Court or in the New York state court in

Manhattan:

> [A]ny legal action or proceeding by or against a Party with respect to or arising out of this Agreement or any Corporate Receivables Program Transaction shall be brought in the courts of the State of New York in the borough of Manhattan, or of the United States of America in the Southern District of New York.

25.     The Corporate Seller Program Agreement sets forth TRE's obligations.

26.     Section 3.2 requires TRE to perform the following duties and functions in

connection with its role as Platform Administrator:

> TRE, as Platform Administrator, will render the following administrative services: (i) administering the Corporate Receivables Program; (ii) administering Postings of Receivables, bidding, Auctions and awarding of Auctions to Winning Bidders; (iii) maintaining a single, exclusive authoritative register with respect to the Purchase Percentages of Traded

Receivables; (iv) receiving payment of the Net Purchase Price from Buyers, and transmitting the Net Purchase Price as provided in Section 5.5.1; (v) determining the amount of Seller Fees due to TRE and each Retained Amount and Retrocessional Amount for each Auction; (vi) maintaining a record of receipts of Collection Proceeds; (vii) determining, paying and transmitting Collection Proceeds to Buyers; (viii) monitoring the occurrence of Account Debtor Insolvency Events, Seller Events of Default and Buyer Events of Default and reporting those that have become known to the Platform Administrator; (ix) delivering to a Buyer communications so requested to be delivered by Seller, and delivering to Seller communications so requested to be delivered by any Buyer; and (x) taking such additional actions incident to the Corporate Receivables Program as TRE may determine to be necessary and appropriate under the circumstances within the Platform Administrator's Administrative Discretion.

27. In connection with TRE's role as Platform Administrator, Section 3.5.3 of the

Corporate Seller Program Agreement provides that "[t]he Platform Administrator shall have no

obligation to disclose to Seller the identity of any Buyer or potential Buyer of Traded

Receivables."

28. In addition, pursuant to Section 3.4.2 of the Corporate Seller Program Agreement,

TRE had the duty to act as an intermediary and transmit any relevant information to the

unidentified potential buyer on behalf of Cargill and CFSI:

Notwithstanding anything herein to the contrary, all communications by and between Seller and any Buyer in connection with the Corporate Receivables Program, and *vice-versa*, shall be made exclusively through TRE and not by Seller directly to any Buyer or by any Buyer directly to Seller.

29. In furtherance of TRE's role as the exclusive contact with buyers or potential

buyers of a seller's receivables, Section 6.2.1 of the Corporate Seller Program Agreement

authorized TRE "to make available to Buyers and potential Buyers of Receivables such Seller

Information and Account Debtor Information as Seller may provide to the Platform

Administrator from time to time."

30.     Under these provisions, TRE reserved to itself the sole ability to communicate with potential buyers of receivables made available by the seller, and concomitantly obligated itself to give information to these potential buyers.  Accordingly, pursuant to Section 3.5.3 of the Corporate Seller Program Agreement, absent disclosure by TRE, the seller of receivables on TRE's exchange would never know the buyer's identity, and pursuant to Section 3.4.2 of the Corporate Seller Program Agreement, and even if TRE disclosed the buyer's identity, Cargill and CFSI could not communicate directly with the buyer in any circumstances.

### C.     Cargill and CFSI Disclosed the Nature of the Mercator Receivables

31.     From the outset of their relationship, TRE encouraged Defendants to make receivables available for the TRE Platform.

32.     For example, in an email from Bos Smith, Senior Director and Head of Buyer Development of TRE to Michael Gonik, Managing Director of TRE, and Cargill/CFSI on December 10, 2013, Smith stated, with respect to a proposed transaction, "I think I just heard Mike [Gonik] begging for some of that action."  In an email from Michael Gonik of TRE to Cargill/CFSI on February 20, 2014, Gonik asked, "What can you throw our way next week?"

33.     In an email from Michael Gonik to Cargill/CFSI on February 28, 2014, Gonik again asked, "[a]nything available on this one?  Buyers [sic] asking as last trade in October."

34.     In response to TRE's repeated requests for more business, Cargill and CFSI proposed various receivables for potential posting on the exchange, and were transparent about the nature of the transactions involved.  As part of this process, Cargill and CFSI presented to TRE receivables that it would consider listing on the TRE Platform based on certain monetary conditions, and TRE gauged interest among buyers for those receivables.

35.     For example, in an email on January 10, 2014, Cargill/CFSI wrote to Bos Smith of TRE, proposing:

Yet another name for you.

[REDACTED], sells throughout [REDACTED] (we'll look into financing those trades in the future.)  These receivables arise from Cargill selling major shipments to [REDACTED], which it then breaks up and sells to smaller distributors.  180 day terms, pricing around L+3%, this should be repeatable business.  We can get financials if needed.

36.     Bos Smith of TRE replied, "[t]his is awesome, the more the merrier at this point."

37.     TRE would then work with Cargill and CFSI to identify which receivables should be placed on the TRE Platform.  Frequently, the parties discussed receivables for months prior to TRE's determination that it had located an interested buyer for those specific receivables and before informing Cargill and CFSI that they should place such receivables on the TRE Platform for sale.

38.     In 2013, TRE solicited and encouraged Cargill and CFSI to place more receivables on the TRE Platform, in connection with which TRE and Defendants discussed certain transactions that Cargill or CFSI was contemplating with Mercator, but had not yet executed.  In discussing these transactions, which ultimately created the Mercator Receivables, Cargill and CFSI were completely transparent with TRE about the transactions resulting in the generation of the accounts receivable—*i.e.*, a Cargill entity would sell a commodity to Mercator on deferred payment terms, and another entity within the Cargill group would repurchase the commodity from Mercator, paying on sight.

39.     Specifically, on October 1, 2013, Cargill/CFSI fully disclosed the nature of the contemplated transactions with Mercator to Jeff Kleinops and Bos Smith, both of TRE:

Have a new name for your feedback.  Company is called Mercator Lines (Singapore) Ltd. ("MLL").  They are part of the Mercator Group which is involved in coal, oil, gas, commodity transportation, and dredging and trades on the NSE and BSE in India since 1994.  MLL trades under the symbol EEG on the SGX in Singapore and publishes publically available financials.  The Company owns 13 dry bulk carriers and operates an

additional one under a lease.  Cargill's Ocean Transport group has leased these ships from MLL in the past and is likely to do so in the future can't guarantee this though and such leases would not collateralize this transaction)

Cargill has done various transactions with MIL and the group over the years, including purchase/sale of freight and coal totally about $44MM. We had previously discussed freight A/Rs, but this transaction does NOT involve those just to be clear as it is a shipping company.

Cargill will have trade-based A/Rs, most likely selling oil, fuel, or coal to MIL on 180-day terms, however, in this situation <u>Cargill would also be on the other side of the transaction, immediately repurchasing the commodity, paying on sight, leaving the company with funding for 180 days, but not actually using the asset they purchase.</u>  Wanted to get your thoughts on this as they do a lot of business in India, Indonesia, and the region which I know some of your investors have shown interest in.

We're looking to do $15MM and could be done in the next two weeks if we get the numbers to work.  Would likely need to see about L+300 all in on this.

(Emphasis added).

40.     Within the hour on that same day, October 1, 2013, Jeff Kleinops of TRE responded to Cargill/CFSI with approval and in no uncertain terms: "This is right in the strike zone and pricing should be fine."

41.     On October 29, 2013, before Cargill and CFSI entered into any of the three subject Mercator transactions, or offered any of them for sale through TRE, Cargill/CFSI sent an email about the transactions to Mark Perrin, TRE's Corporate Counsel, and Bos Smith of TRE, enclosing drafts of the underlying sales agreements with Mercator that reflected the terms of the transactions.  Cargill requested that TRE not only communicate the nature of the Mercator transactions to potential buyers, but also add a disclaimer to those communications about the nature of the transaction:

To follow-up on our call referenced below, I have attached contracts for each side of a Cargill(1) à 3rd Party à Cargill(2) transaction which results in a receivable for Cargill(1) based on the credit risk of 3rd Party.

Also, we would look to insert the disclaimer below in any transaction involving Cargill-to-Cargill trade flows or those where a Cargill entity is inserted between two related or non-related entities.

<u>The investor understands and by purchasing this asset accepts, that these receivables arise from a series of transactions among three or more entities, with one or more of such entities being Cargill affiliates and at least one entity being unaffiliated with Cargill, Incorporated.  There is no requirement that the actual goods in the underlying transactions physically enter a country in which the Obligor operates.</u>

Furthermore, the investor understands and by purchasing this asset accepts, that invoices may be issued under contracts whereby the Obligor has explicitly disclaimed the existence of any commercial dispute or disagreement between itself and Cargill relating to the underlying transactions.  Such a disclaimer is contained in either the [sales agreement] or a tri-party agreement.  <u>In such cases, the Obligor has taken title to and accepted all aspects of a shipment and may have further accepted payment from a subsequent buyer to which the Obligor on-sells the respective goods.</u>  In these situations, the Obligor's explicit disclaimer of the existence of any commercial dispute eliminates commercial dispute or disagreement as a reason for an Obligor's default on its payment obligations.

(Emphasis added.)

42.     The draft contracts for the proposed Mercator transactions attached to Cargill's October 29, 2013 email to Mark Perrin and Bos Smith of TRE made clear that there would be two transactions in connection with any Mercator receivable that would be sold on the TRE exchange, the first transaction, which was a bona fide sale of goods, involved a deferred purchase contract pursuant to which a Cargill entity would sell goods to Mercator, and the second transaction involved a separate sight sales contract pursuant to which Mercator would sell the goods to another Cargill entity.

43.    In an email dated January 2, 2014, Cargill and CFSI again made clear to TRE the underlying transactions relating to the Mercator receivables:

> Cargill has both purchased and sold freight services from/to Mercator and also delivered coal cargos to the company.  To date, all transactions have been paid on time and within contracted terms.  Going forward, Cargill looks to expand its offering of freight services to Mercator and will also extend terms to the company on flows of coal or petroleum ("bunker") products.  These cargos may be used by Mercator, sold to a 3rd party, or resold to Cargill for the purpose of extending financing to Mercator.

(Emphasis added).

44.    Following these disclosures, in January 2014, representatives from Cargill and CFSI met in person with Michael Gonik, Mark Perrin, and Bos Smith of TRE and discussed TRE's receivables capacity and Cargill's and CFSI's then-current offering list, including background and expected pricing levels for those offerings, including the Mercator transactions. TRE informed Cargill and CFSI that a number of buyers were looking at the Mercator receivables and that progress had been positive, but that there was not yet a firm capacity for the Mercator receivables.

45.    In an email dated February 25, 2014, Cargill and CFSI again described to Bos Smith of TRE the nature of the Mercator transactions, clearly stating again that the commodity that they were planning to sell to Mercator "may be … resold to Cargill for the purpose of extending financing to Mercator."  In addition to providing TRE again with information as to the nature of the contemplated Mercator transactions, with that email, Cargill and CFSI also provided TRE with extensive background material on Mercator's financial position.

46.    That same day, February 25, 2014, in a separate email to Bos Smith of TRE, Cargill and CFSI yet again made clear the nature of the transactions and further stated that:

> "The underlying commodity may not enter Singapore";

15

and

"Cargill Buyer (entity TBD) shall enter into a separate commercial contract with [Mercator] to purchase the sale Commodity for payment as sight to [Mercator]."

**D.     TRE Induced Cargill and CFSI to Auction the Mercator Receivables on the Exchange**

47.     On June 5, 2014, eight months after Cargill and CFSI first disclosed the potential transactions with Mercator and TRE made clear that such transactions were "right in the strike zone," Michael Gonik of TRE informed Cargill/CFSI with respect to the Mercator transactions, "I have a few names taking a serious look.  Should know early-mid next week."

48.     On June 23, 2014, Michael Gonik of TRE wrote to Cargill/CFSI, "Am trying to motivate the Mercator trade.  Can you register them as an AD to help the process along?  If you have a spreadsheet with pay history would help too."

49.     On July 29, 2014, Michael Gonik of TRE wrote to Cargill/CFSI, "[i]n process now on the Mercator approval to $5mm.  Is 2 week timeline ok for you?"  Cargill/CFSI replied, "I will need two weeks for origination.  Doubt we will originate without strong indication given previous trouble with the name."  In response, Gonik wrote, "[s]hould know in next 2 weeks or so but looking positive so far."

50.     In an email on August 11, 2014, with the subject line "Mercator," Michael Gonik of TRE asked Cargill/CFSI: "Will you be ready to post this week if lines in place?  getting close."

51.     In an email exchange on August 20 and 21, 2014, Michael Gonik of TRE asked Cargill/CFSI, "Any news on . . .  Mercator?"  Cargill responded, "[w]orking on Mercator this week, should be able to get something done, hoping end of August/early September."  Gonik then replied, "[o]k.  Important to get done this month as lines have been opened."

52.     In an email exchange on September 8, 2014, Cargill/CFSI wrote to Michael Gonik of TRE: "Mike, We are proceeding to originate $5MM of Mercator.  Wanted to confirm that your confidence level is still extremely high on this one.  Thanks."  Gonik responded, "Yes. Ready to go.  have told buyer to expect early in week of 22nd."

53.     At no time during any of the communications with TRE regarding the potential transactions with Mercator and the ultimate Mercator Receivables beginning in October 2013 did TRE ever state or imply that the transactions with Mercator (or transactions of that type) that Cargill and CFSI were planning to auction using TRE's exchange were inappropriate for inclusion in the TRE Corporate Receivables Program, nor did TRE ever state or imply that the eventual buyer, ICICI UK, did not understand the underlying transactions, or that placing any such transaction for auction on TRE's exchange would violate any of the representations and warranties contained within the Corporate Seller Program Agreement.  To the contrary, at all times, TRE encouraged Cargill and CFSI to post the transactions at issue for auction.

54.     Based on the communications with TRE, TRE's assertion that it had identified a buyer for the receivables relating to Mercator and TRE's direction to Cargill and CFSI to post the Mercator Receivables, on three different dates that were months apart, Cargill and CFSI placed the following receivables for auction on TRE's exchange:

| Consummation/Funding Date | TRE Auction No. | Face Value | Maturity |
|---|---|---|---|
| December 30, 2014 | 30530 | $3,499,999,48 | April 22, 2015 |
| October 31, 2014 | 30410 | $1,500,093.34 | April 27, 2015 |
| April 10, 2015 | 30711 | $3,999,999.81 | September 25, 2015 |

### E.    Cargill and CFSI Complied With Their Contractual Disclosure Obligations

55.    In connection with listing the Mercator Receivables for auction on TRE's

exchange, Cargill and CFSI complied with their disclosure obligations under the Corporate

Seller Program Agreement, including providing all applicable and required information.

56.    In consequence of the Corporate Seller Program Agreement's prohibition on any

communication by the seller with any buyer, Defendants authorized and expected that TRE

would communicate with the buyer on Defendants' behalf, in particular disclosing the specifics

of the Mercator transactions.

57.    Section 6.2 of the Corporate Seller Program Agreement thus provides that:

> Seller authorizes the Platform Administrator to make available to Buyers
> and potential Buyers of Receivables such Seller Information and Account
> Debtor Information as Seller may provide to the Platform Administrator
> from time to time.  Account Debtor Information will include such
> information as required under the Rules and Procedures attached hereto as
> Exhibit 2.

> * * *

> Seller acknowledges and agrees that Buyers and potential Buyers of Receivables
> may rely on Seller Information and Account Debtor Information in making
> informed decisions whether to bid on and purchase Receivables over the
> Exchange.

58.    In addition, as described above, Cargill and CFSI provided much more additional

information regarding the Mercator Receivables to TRE.  Pursuant to the Corporate Seller

Program Agreement, TRE was authorized to provide the information disclosed by Cargill and

CFSI to a buyer or potential buyer.  Cargill and CFSI reasonably expected that TRE would

provide such information to potential buyers, including ICICI UK.

59.    Finally, both prior to and after ICICI UK purportedly purchased the Mercator

Receivables, Cargill and CFSI answered all inquires and questions communicated by TRE

relating to those receivables.

18

**F.    TRE Made Misleading and/or Grossly Negligent Communications to ICICI UK about the Mercator Receivables**

60.    In its role as intermediary, upon information and belief, from June to October 2014, TRE had multiple communications with ICICI UK regarding the Mercator Receivables, prior to the sale of the first of the Mercator Receivables in October 2014.  In addition, upon information and belief, ICICI UK requested and TRE provided certain information related to the Mercator Receivables prior to the October 2014 sale.  Then in December 2014 and April 2015, TRE facilitated the sale of two additional Mercator Receivables to ICICI UK.  During the entire period between in which TRE was in communication with ICICI UK regarding potential purchase of the Mercator Receivables, the Corporate Seller Program Agreement authorized TRE to share with ICICI UK the nature of the transactions underlying the Mercator Receivables, along with the rest of the information that Cargill and CFSI provided to TRE.  Cargill and CFSI reasonably expected that TRE would provide a potential buyer the information that they had furnished to TRE and requested TRE disclose.  In addition, ICICI UK could have requested through TRE additional information regarding the Mercator Receivables, and Cargill and CFSI would have complied with their contractual obligation to provide any such information.

61.    To the extent that Plaintiff correctly alleges that it did not receive certain information regarding the Mercator Receivables, and that such omission constitutes a breach of the Corporate Seller Program Agreement, TRE, as the entity responsible for communicating that information, is the party responsible for Plaintiff's alleged damages.  Any such behavior by TRE was either grossly negligent or wrongful, as it was willfully designed to mislead ICICI UK.

**G.    Mercator Becomes Insolvent and Misses the Payment Date on Two of the Mercator Receivables**

62.    Upon information and belief, Mercator is suffering from Insolvency as defined in the Corporate Seller Program Agreement.

63.     Section  5.8.3 of the Corporate Seller Program Agreement expressly provides that the "Buyer …shall bear the sole credit risk of an Account Debtor Insolvency Event with respect to the payment of such Receivables."

64.     Under Section 8.2.1 of the Corporate Seller Program Agreement, if the "Account Debtor fails to pay a Traded Receivable in full by the Repurchase Date," the seller is required to repurchase the Traded Receivables "unless an Account Debtor Insolvency Event has occurred on or prior to such Repurchase Date."  (Emphasis added.)

65.     Upon information and belief, an Account Debtor Insolvency Event with respect to Mercator within the meaning of the Corporate Seller Program Agreement occurred on or prior to the dates when payment by Mercator on the Mercator Receivables was due.  In April 2015, Mercator did not make the payments required under two of the Mercator Receivables.  Upon information and belief, Mercator did not make the payments due in April 2015, and has been unable to meet any payment obligations to certain creditors since April 2015, because it is insolvent.  Upon information and belief, Mercator is also currently in the process of restructuring its obligations.

66.     Accordingly, based on Mercator's Insolvency, Cargill and CFSI do not have any repurchase obligations with respect to the Mercator Receivables.

**H.     TRE Improperly Demanded Repurchase of the Mercator Receivables by Cargill and CFSI**

67.     Despite actively soliciting Cargill and CFSI to place the Mercator transactions for sale on TRE's exchange, and unreservedly acknowledging that the Mercator Receivables qualified as receivables under TRE's Corporate Receivables Program, in June 2015, TRE flipped its position.

68.     On June 12, 2015, in clear intentional misapprehension of the rights and obligations created by the Corporate Seller Program Agreement, as relevant to this Third-Party Complaint, TRE demanded that Cargill and CFSI repurchase the Mercator Receivables from the buyer, based on purported breaches of representations and warranties by the seller in the Corporate Seller Program Agreement.

69.     On June 24, 2015, TRE then forwarded written correspondence from the still-unidentified buyer's external counsel demanding that Defendants repurchase the Mercator Receivables.

70.     Only after ICICI UK filed the instant lawsuit against them did Cargill and CFSI learn the identity of the purported buyer of the Mercator Receivables.  Prior to that time, TRE in its administrative capacity as Platform Administrator and Intermediary, had all communications with the buyer, and Cargill and CFSI were not privy to any of those communications, deliberately keeping Cargill and CFSI in the dark regarding the content of those communications.

71.     In short, having actively supported and facilitated Cargill's and CFSI's offering of the Mercator Receivables on TRE's Platform, TRE then dishonestly and in utmost bad faith did an about-face in June 2015 and asserted that Defendants had breached the Corporate Seller Program Agreement by offering those receivables in the first place.  Assertion of such trumped-up breaches by Defendants was nothing but a pretext by TRE, acting as a shill for a purchaser whom it refused even to identify, and who now wants to unwind the transactions only because Mercator is insolvent and has suspended payment on its obligations, including payments related to the Mercator Receivables.

## I.       Plaintiff's Complaint Against Cargill and CFSI

72.     In this Action, Plaintiff ICICI UK alleges that Cargill and CFSI breached the

Corporate Seller Program Agreement because they purportedly breached certain representations

and warranties therein and because they would not agree to repurchase the Mercator

Receivables when Mercator failed to make certain payments in April 2015.  ICICI UK alleges

that the Corporate Seller Program Agreement conferred third-party beneficiary rights to it.

73.     Plaintiff's claims have no merit, however, as a consequence of Plaintiff's

commencement of this Action, Cargill and CFSI have been forced to incur legal fees and other

costs, and they face potential liability on Plaintiff's claims seeking rescission or monetary

damages.

74.     If Cargill and CFSI are found liable on any claim asserted by Plaintiff in this

Action, TRE should be required to pay for or indemnify any such liability as a result of its own

fraud, grossly negligent and wrongful conduct, and multiple material breaches of the Corporate

Seller Program Agreement.

### FIRST CAUSE OF ACTION
#### (Breach of Contract)

75.     Cargill and CFSI repeat and reallege each allegation contained in paragraphs 1

through 74 hereof, as if fully set forth herein.

76.     In the event that Cargill and/or CFSI are found liable to ICICI UK, TRE is liable

to Cargill and/or CFSI.

77.     Defendants and TRE are parties to a valid and enforceable agreement, the

Corporate Seller Program Agreement.

78.     Each of Cargill and CFSI at all times has performed its obligations under the

Corporate Seller Program Agreement.

79.     The Corporate Seller Program Agreement required TRE to perform enumerated duties and functions as Platform Administrator, as described above.

80.     As set forth in detail above, if Plaintiff's allegations are correct, TRE materially breached its obligations under the Corporate Seller Program Agreement as Platform Administrator by failing to provide to ICICI UK information that Cargill and CFSI provided to TRE regarding the nature of, and other particulars concerning, the Mercator Receivables.

81.     In the alternative, TRE was grossly negligent and performed its duties with respect to the Mercator Receivables with a knowing, reckless disregard for the consequences of its actions, or acted wrongfully or with the intention to mislead ICICI UK by concealing the nature of the Mercator Receivables.

82.     By reason of the foregoing, Cargill and CFSI have suffered substantial damages, and continue to suffer damages, as result of TRE's breach of the Corporate Seller Program Agreement, including the attorney's fees, costs and expenses Cargill and CFSI have incurred in connection with the claims asserted by Plaintiff ICICI UK, as well as the potential liability to Plaintiff for damages in this Action.

<u>**SECOND CAUSE OF ACTION**</u>
<u>**(Breach of Contract)**</u>

83.     Cargill and CFSI repeat and reallege each allegation contained in paragraphs 1 through 82 hereof, as if fully set forth herein.

84.     In the event that Cargill and/or CFSI are found liable to ICICI UK, TRE is liable to Cargill and CFSI.

85.     Defendants and TRE are parties to a valid and enforceable agreement, the Corporate Seller Program Agreement.

86.     Each of Cargill and CFSI at all times has performed its obligations under the Corporate Seller Program Agreement.

87.     The Corporate Seller Program Agreement required TRE to perform enumerated duties and functions as intermediary, as described above.

88.     As set forth in detail above, if Plaintiff's allegations are correct, TRE materially breached its obligations under the Corporate Seller Program Agreement as intermediary by failing to provide to ICICI UK information that Cargill and CFSI provided to TRE regarding the nature of, and other particulars concerning, the Mercator Receivables.

89.     In the alternative, TRE was grossly negligent and performed its duties with respect to the Mercator Receivables with a knowing, reckless disregard for the consequences of its actions, or acted wrongfully or with the intention to mislead ICICI UK by concealing the nature of the Mercator Receivables.

90.     By reason of the foregoing, Cargill and CFSI have suffered substantial damages, and continue to suffer damages, as result of TRE's breach of the Corporate Seller Program Agreement, including the attorney's fees, costs and expenses Cargill and CFSI have incurred in connection with the claims asserted by Plaintiff ICICI UK, as well as the potential liability to Plaintiff for damages in this Action.

## THIRD CAUSE OF ACTION
### (Breach of the Covenant of Good Faith and Fair Dealing)

91.     Cargill and CFSI repeat and reallege each allegation contained in paragraphs 1 through 90 hereof, as if fully set forth herein.

92.     In the event that Cargill and CFSI are found liable to ICICI UK, TRE is liable to Cargill and/or CFSI.

93.     Underlying the Corporate Seller Program Agreement is an implied covenant of good faith and fair dealing that attaches to all contracts under New York law.  In the present case, the implied covenant prohibits the parties from engaging in arbitrary or unreasonable conduct that frustrates the purpose of the Corporate Seller Program Agreement or otherwise prevents the other party from receiving the fruits of the Corporate Seller Program Agreement.

94.     At all relevant times, each of Cargill and CFSI performed all of its obligations under the Corporate Seller Program Agreement.

95.     TRE breached the implied covenant under the Corporate Seller Program Agreement because, if the Mercator Receivables must be repurchased for purported breaches of certain representations and warranties as alleged by Plaintiff, that would eviscerate Defendants' fundamental understanding of the terms of the Corporate Seller Program Agreement and their expectations of the parties' rights and responsibilities thereunder.

96.     TRE's assurances that the Mercator Receivables could and should be sold on the TRE Platform in accordance with the Corporate Seller Program Agreement induced Cargill and CFSI to place them on the TRE Platform.

97.     Far from acting in good faith, if the sale of the Mercator Receivables on the TRE Platform violated the representations and warranties in the Corporate Seller Program Agreement, TRE's actions were either grossly negligent or wrongful, and TRE breached the implied covenant of good faith and fair dealing, frustrated the purposes of the Corporate Seller Program Agreement, and destroyed Cargill and CFSI's expectations that that the Mercator Receivables were properly auctioned pursuant to the Corporate Seller Program Agreement.

98.     Further, TRE orchestrated the sale of the Mercator Receivables in bad faith with the express intent to obtain an economic benefit at the expense of Cargill and CFSI.

99.     TRE's actions violate the implied covenant of good faith and fair dealing in the Corporate Seller Program Agreement, as applicable under New York law.

100.    By reason of the foregoing, Cargill and CFSI have suffered substantial damages, and continue to suffer damages, as result of TRE's breach of the Corporate Seller Program Agreement, including the attorney's fees, costs and expenses Cargill and CFSI have incurred in connection with the claims asserted by Plaintiff ICICI UK, as well as the potential liability to Plaintiff for damages in this Action.

### FOURTH CAUSE OF ACTION
### (Common Law Indemnification)

101.    Cargill and CFSI repeat and reallege each allegation contained in paragraphs 1 through 100 hereof, as if fully set forth herein.

102.    The Corporate Seller Program Agreement required TRE to perform its duties and functions as intermediary and Platform Administrator in a manner that was not grossly negligent, or in a manner that would not constitute willful misconduct or fraud.

103.    TRE reserved to itself the exclusive ability to communicate with any potential buyers of the Mercator Receivables.  Although Cargill and CFSI relied on TRE to convey all of the information they provided regarding the Mercator Receivables to any potential buyer, TRE knowingly and willfully failed to do so.

104.    To the extent that Cargill and/or CFSI are found liable to Plaintiff, TRE should be required to indemnify them, because TRE fraudulently caused Defendants to post the Mercator Receivables for sale on the TRE Platform, and because it willfully and wrongfully, and/or with gross negligence, failed to convey Defendants' information regarding the Mercator Receivables to ICICI UK.

105.    By reason of the foregoing, Cargill and CFSI have suffered substantial damages, and continue to suffer damages, as result of TRE's breach of the Corporate Seller Program Agreement, including the attorney's fees, costs and expenses Cargill and CFSI have incurred in connection with the claims asserted by Plaintiff ICICI UK, as well as the potential liability to Plaintiff for damages in this Action.

**FIFTH CAUSE OF ACTION**
**(Fraud)**

106.    Cargill and CFSI repeat and reallege each allegation contained in paragraphs 1 through 105 hereof, as if fully set forth herein.

107.    In the event that Cargill and/or CFSI are found liable to ICICI UK, TRE is liable to Cargill and/or CSFI.

108.    As set forth in detail above, Defendants fully disclosed the nature of the Mercator Receivables to TRE employees, including Bos Smith, Mark Perrin, Michael Gonik and others, and asked that they convey this information to any potential buyer.  As further set forth in detail above, between October 2013 and September 2014, Smith, Perrin, and Gonik, repeatedly assured Defendants that the Mercator Receivables were appropriate for inclusion in the Corporate Receivables Program and thus for sale on the TRE Platform.  If Plaintiff's allegations are correct, neither Smith, Perrin, Gonik, nor any other TRE employee disclosed this information to ICICI UK.  Likewise, neither Smith, Perrin, Gonik, nor any other TRE employee disclosed that TRE's representations to Cargill and CFSI regarding the appropriateness of offering the Mercator Receivables for sale on the TRE Platform were false, until TRE asserted for the first time in June 2015 that Cargill and CFSI had breached representations and warranties in connection with offering those receivables for sale.

109.    Upon information and belief, Bos Smith, Mark Perrin, and Michael Gonik of TRE knew that their representations to Defendants on behalf of TRE were false, but made them anyway, in an effort to increase the volume of trades—and therefore revenues—on the TRE Platform.

110.    In justifiable reliance on these misrepresentations and omissions, Defendants posted each of the Mercator Receivables on the TRE Platform in October 2014, December 2014, and April 2015, respectively.

111.    By reason of the foregoing, Cargill and CFSI have suffered substantial damages, and continue to suffer damages, as result of TRE's fraudulent conduct, including the attorney's fees, costs and expenses Cargill and CFSI have incurred in connection with the claims asserted by Plaintiff ICICI UK, as well as the potential liability to Plaintiff for damages in this Action.

## DEMAND FOR RELIEF

WHEREFORE, Defendants and Third-Party Plaintiffs Cargill and CFSI demand judgment against Third-Party Defendant TRE as follows:

A.    As to their first cause of action, for breach of contract, awarding damages in an amount to be determined by reason of TRE's breaches of its obligations as Platform Administrator under the Corporate Seller Program Agreement, including the full amount of any judgment in favor of Plaintiff and against Defendants and Third-Party Plaintiffs in this Action, and, irrespective of such liability, the attorney's fees, costs, and expenses incurred in defense of Plaintiff's claims, together with interest on all such amounts;

B.    As to their second cause of action, for breach of contract, awarding damages in an amount to be determined by reason of TRE's breaches of its obligations as intermediary under the Corporate Seller Program Agreement, including the full amount of any judgment in favor of

Plaintiff and against Defendants and Third-Party Plaintiffs in this Action, and, irrespective of such liability, the attorney's fees, costs, and expenses incurred in defense of Plaintiff's claims, together with interest on all such amounts;

C.     As to their third cause of action, for breach of the implied covenant of good faith and fair dealing, awarding damages in an amount to be determined, including the full amount of any judgment in favor of Plaintiff and against Defendants and Third-Party Plaintiffs in this Action, and, irrespective of such liability, the attorney's fees, costs, and expenses incurred in defense of Plaintiff's claims, together with interest on all such amounts;

D.     As to their fourth cause of action, for indemnification, determining that TRE be required to indemnify Defendants and Third-Party Plaintiffs, and awarding damages in an amount to be determined, including the full amount of any judgment in favor of Plaintiff and against Defendants and Third-Party Plaintiffs in this Action, and, irrespective of such liability, the attorney's fees, costs, and expenses incurred in defense of Plaintiff's claims, together with interest on all such amounts;

E.     As to their fifth cause of action, for fraud, awarding damages in an amount to be determined, including the full amount of any judgment in favor of Plaintiff and against Defendants and Third-Party Plaintiffs in this Action, and, irrespective of such liability, the attorney's fees, costs, and expenses incurred in defense of Plaintiff's claims, together with interest on all such amounts;

F.     That an order be granted in favor of Defendants and Third-Party Plaintiffs awarding them their attorney's fees, costs, and expenses in this Action and this Third-Party Action, and for such other and further relief as the Court deems just and proper.

Dated: New York, New York
       August 24, 2015

                          SIDLEY AUSTIN LLP


                          By:  /s/ Steven M. Bierman
                               Steven M. Bierman
                               sbierman@sidley.com
                               Marissa Alter-Nelson
                               malternelson@sidley.com
                               SIDLEY AUSTIN LLP
                               787 Seventh Avenue
                               New York, New York 10019
                               Telephone:  (212) 839-5300
                               Facsimile:  (212) 839-5599

                          *Counsel for Defendants and Third-Party Plaintiffs
                          Cargill, Incorporated and Cargill Financial
                          Services International, Inc.*