UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
:
ICICI BANK UK PLC,                                          :    Case No. 15-5379 (VEC)
                                                            :
                           Plaintiff,                       :
                                                            :
          - against -                                       :    **COMPLAINT AGAINST**
                                                            :    **THE RECEIVABLES**
CARGILL, INCORPORATED AND CARGILL                           :    **EXCHANGE, LLC**
FINANCIAL SERVICES INTERNATIONAL,                           :
INC.,                                                       :
                                                            :
                           Defendants.                      :
                                                            :
------------------------------------------------------------X
                                                            :
CARGILL, INCORPORATED AND CARGILL                           :
FINANCIAL SERVICES INTERNATIONAL,                           :
INC.,                                                       :
                                                            :
                           Third-Party Plaintiffs,          :
                                                            :
          - against -                                       :
                                                            :
THE RECEIVABLES EXCHANGE, LLC,                              :
                                                            :
                           Third-Party Defendant.           :
                                                            :
------------------------------------------------------------X
                                                            :
ICICI BANK UK PLC,                                          :
                                                            :
                                                            :
                                                            :
                           Plaintiff on the                 :
                           Additional Claim,                :
                                                            :
          - against -                                       :
                                                            :
THE RECEIVABLES EXCHANGE, LLC,                              :
                                                            :
                           Defendant on the                 :
                           Additional Claim                 :
                                                            :
------------------------------------------------------------X

Plaintiff ICICI Bank UK plc (the "Bank") by its attorneys, Sullivan & Worcester LLP, for its complaint against The Receivables Exchange, LLC ("TRE") avers as follows:

1. On July 10, 2015, the Bank commenced this action against Defendants Cargill, Incorporated ("Cargill Inc.") and Cargill Financial Services International, Inc. ("CFSI" and collectively with Cargill Inc., "Cargill") seeking, among other things, to enforce its contractual right to rescind its purchase of three accounts receivable (the "A/Rs") the Bank purchased from Cargill through the facilities of the TRE.

2. As averred in its complaint against Cargill, the Bank purchased each A/R through TRE based on, among other things, Cargill's representations and warranties that each arose from a bona fide sale of specified goods by Cargill to a specific counterparty, Mercator Lines (Singapore) Limited ("Mercator").

3. As the Bank further averred, in contravention of Cargill's representations and warranties, the A/Rs, in fact, did not relate to bona fide sales by Cargill to Mercator. Instead, the A/Rs related to notional sales only; the substance of the transactions to which the A/Rs were appended was a loan—actually a series of loans—from Cargill or Cargill affiliates to Mercator.

4. As a result, the Bank has been damaged.

5. Cargill has denied liability to the Bank and has filed a Third-Party Complaint against TRE seeking, inter alia, indemnity for any liability to the Bank.

6. In its Third-Party Complaint, Cargill further avers that it informed TRE of facts sufficient to have alerted TRE to the true nature of the transactions to which the A/Rs were appended.

7. Predicated on Cargill's allegations, the Bank asserts the claims herein against TRE.

Parties

8. The Bank is incorporated under the laws of England and Wales. Its principal place of business is at One Thomas More Square, London, England E1W 1YN.

9. Upon information and belief, Cargill Inc. is incorporated under the laws of Delaware and maintains its principal place of business in Wayzata, Minnesota.

10. Upon information and belief, CFSI is incorporated under the laws of Delaware and maintains its principal place of business in Hopkins, Minnesota.

11. Upon information and belief, TRE is a limited liability company organized under the laws of Louisiana with its principal place of business at 100 Park Avenue, 30th floor, New York, New York 10017. Upon information and belief, TRE's sole member is The New Orleans Exchange, Inc., a corporation organized under the laws of Delaware, with its principal place of business in New Orleans, Louisiana.

12. Upon information and belief, non-party Mercator is incorporated under the laws of Singapore and maintains its principal place of business at No. 8 Temasek Boulevard, Suite 07-02, Suntec Tower 3, Singapore 038988.

Jurisdiction and Venue

13. The amount in controversy exceeds $75,000, exclusive of interests and costs. The Court, therefore, has jurisdiction over the subject matter of this dispute pursuant to 28 U.S.C. § 1332(a)(2), based on diversity of citizenship.

14. The Court has personal jurisdiction over TRE based on TRE's written consent. Personal jurisdiction is based also on New York's long-arm statute, N.Y. C.P.L.R. 302 (McKinney 2010).

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), as agreed by the parties, and because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

## Facts Common To All Claims

16. This action concerns transactions solicited by and facilitated through TRE.

17. TRE describes its business as follows:

> Receivables Exchange ["RecX"] is the leading electronic exchange for the sale and purchase of accounts receivable. In association with NYSE, RecX connects large corporate sellers of receivables with diversified sources of liquidity, including banks, family offices and asset management funds. Transactions over RecX are structured to result in a "true sale" of the receivables, thus offering balance sheet benefits to sellers and attractive risk-adjusted returns to buyers.

http://recx.com/about-the-company (downloaded July 6, 2015).

18. From the perspective of a potential purchaser of accounts receivable such as the Bank, TRE operates as an internet-accessed intermediary, matching purchaser to seller. Via TRE's website, a "member," i.e., a potential purchaser, views a thumbnail description of available accounts receivable. Information includes: the identity of the seller of the receivable, that is, the ostensible seller of goods or services giving rise to the receivable; the identity of the account debtor; the face value of the receivable; and the maturity date. This information is designed to allow an interested purchaser to answer a series of critical questions: Is the seller an acceptable counterparty; is the account debtor an acceptable credit risk; is the underlying trade a transaction more or less likely to be repaid; does the transaction as described have any risk mitigants?

19. Sales through TRE are styled as auctions; and members are permitted to submit "bids" throughout the period a receivable is available for sale. A successful bidder is the

member who offers to buy the receivable at the smallest discount from face value.  Underlying documentation, such as invoices, bills of lading, contracts, etc., are not made available to members at the time of auction.

20. On or about  November 8, 2012, Cargill, as "Seller," and TRE executed a document entitled: "Corporate Seller Program Agreement Effective as of November 8, 2012 By and Between Cargill, Incorporated, Cargill Financial Services International, Inc. and The Receivables Exchange, LLC with All Buyers of Trade Receivables Over the Receivables Exchange Being Third-Party Beneficiaries."  That agreement together with its Exhibits 1 and 2 ("Definitions and Rules of Construction" and "Rules and Procedures") constitute the "Seller Agreement."

21. The Seller Agreement provides that a purchaser who buys receivables from Cargill is a "third-party beneficiary" of that Agreement.

22. Pursuant to the Seller Agreement  Cargill represented and warranted that any receivable it sold via TRE would relate to Cargill's actual, unconditional sale of specified goods or services to a specified counterparty, *i.e.*, the specified account debtor.

23. Thus, the  Seller Agreement provides that "Receivable means Seller's accounts, contracts rights, [etc.] and all other form of payment obligations originally owing to Seller, in each case arising out of the sale of goods or the rendering of services by Seller."  Seller Agreement, Exhibit 1.

24. Further, the Seller Agreement sets forth Cargill's express representation and warranty that, inter alia, any receivable Cargill sold via TRE:

    a. arose from a "bona fide, arm's length sale of goods or services in the ordinary course of the Seller's business"  (Seller Agreement § 10.1.5); and

b. "is governed by a Sales Contract between the Account Debtor and Seller and is subject to the general and conditions that apply to sales of goods and furnishing of services by Seller to its customers" (Seller Agreement § 10.1.7).

25. TRE organized its business to maintain a position squarely in the middle of a Seller, such as Cargill, and a Buyer, such as the Bank. Thus, the Seller Agreement provides that TRE is to act as the Platform Administrator:

> TRE, as Platform Administrator, will render the following administrative services; (i) administering the Corporate Receivables Program; (ii) administering Postings of Receivables, bidding, Auctions and awarding of Auctions to Winning Bidders; (iii) maintaining a single exclusive authoritative register with respect to the Purchase Percentages of Traded Receivables; (iv) receiving payment of the Net Purchase Price from Buyers, and transmitting the Net Purchase Price as provided in Section 5.5.1; (v) determining the amount of Seller Fees due to TRE and each Retained Amount and Retrocessional Amount for each Auction; (vi) maintaining a record of receipts of Collection Proceeds; (vii) determining, paying and transmitting Collection Proceeds to Buyers; (viii) monitoring the occurrence of Account Debtor Insolvency Events, Seller Events of Default and Buyer Events of Default and reporting those that have become known to the Platform Administrator; (ix) delivering to a Buyer communications so requested to be delivered by Seller, and delivering to Seller Communications so requested to be delivered by any Buyer; and (x) taking such additional actions incident to the Corporate Receivables Program as TRE may determine to be necessary and appropriate under the circumstances within the Platform Administrator's Administrative Discretion.

(Seller Agreement § 3.2).

26. The Seller Agreement further provides that TRE is the sole intermediary between Cargill and Seller with respect to receivables:

> Notwithstanding anything herein to the contrary, all communications by and between Seller and any Buyer in Connection with the Corporate Receivables Program, and vice-versa, shall be made exclusively through TRE and not by Seller directly to any Buyer or by any Buyer directly to Seller.

(Seller Agreement § 3.4.2).

27.     On or about May 28, 2014, the Bank, as "Buyer," and TRE executed a form of agreement provided by TRE entitled "Corporate Receivables Buyer Agreement" (the "Buyer Agreement").

28.     The Buyer Agreement makes repeated reference to "Seller Program Agreements," *i.e.*, agreements between TRE and sellers of accounts receivable of which the Seller Agreement is an example.  For example, the Buyer Agreement provides:

> **2.5 Seller Program Agreemen**t.   Each Receivable Interest purchased under a Seller Program shall be governed by the terms of the Seller Program Agreement applicable to such Seller Program....

29.     The Buyer Agreement also prohibits the Bank from communicating with the seller of a receivable except through TRE.  *See* Buyer Agreement § 3.4.

30.     Beginning in June 2014, the Bank began to consider purchasing receivables offered by Cargill through TRE, in particular, receivables owed to Cargill by Mercator.

31.     In connection with that effort, at the same time, TRE provided the Bank with the Seller Agreement via its website.

32.     At the same time, TRE provided the Bank with a document entitled "Program Summary Cargill Program Overview " (the "Cargill Program Summary") via its website.

33.     In its entirety, the Cargill Program Summary provides:

> ***The Sellers under the Cargill Program are Cargill, Incorporated and Cargill Financial Services International, Inc., a wholly owned subsidiary of Cargill, Incorporated.  The Receivables to be sold by each Seller under the Program are Receivables originated by such Seller.***  Neither Seller has any liability with respect to Receivables sold by the other Seller.
>
> This summary overview of the Cargill Program is qualified in its entirety by the applicable terms of the Seller Agreement and other documents posted in the Legal Documents section.  Buyers should

> be familiar with the terms of such documents before they submit
> any bids to purchase Receivables under the Program.

(emphasis added).

34. Upon information and belief, TRE wrote the Cargill Program Summary or knowingly or recklessly permitted the Cargill Program Summary to be posted on its website.

35. At the same time, TRE provided the Bank with a document entitled "Confidential Information Memorandum Corporate Program Seller" ("Info Mem") via its website. Among other things, the Info Mem identified Mercator as the "Obligor," *i.e.*, the account debtor, and the "good (sic)/service provided" as "Bunker Fuel for Ships." TRE provide the Bank with the Cargill Program Summary and the Info Mem intending that the Bank rely on their contents.

36. Beginning in or about December 2014, having reviewed the Seller Agreement, the Cargill Program Summary, and the Info Mem and in reasonable reliance thereon, the Bank purchased the A/Rs in dispute, through three distinct TRE-organized "auctions." Each A/R ostensibly represented the sale of specified goods by Cargill to Mercator.

37. TRE solicited the Bank's purchase of the A/Rs.

38. For example, on June 5, 2014, Michael Gonik of TRE sent an email to the Bank saying: "I know we touched on 'Mercator Lines' as maybe not the best fit but wanted to follow-up as we might have about $3.5mm available for 180 days. Pricing is expected to be L+4.00-5.00%."

39. As to what would become the first A/R, on July 23, 2015, Michael Gonik of TRE sent an email to the Bank saying: "Would you be interested in $5mm of Mercator in next 2 weeks or so? Same terms or maybe a bit tighter on the margin."

40. As to what would become the second A/R, on November 19, 2014, for example, Michael Gonik of TRE sent an email to the Bank saying: "Just a heads up that we're expecting another $5mm of Mercator before month-end."

41. As to the third A/R, on April 1, 2015, for example, Michael Gonik of TRE sent an email to the Bank saying: "$4mm of Mercator is now available.  Better late than never!  Let me know what your timing looks like."

42. The Bank purchased the A/Rs based on the documents and information TRE provided via its website, including the Seller Agreement, the Cargill Program Summary, and the Info Mem, and on the abstract of information the essential elements of which are set forth in the chart below.

| Consummation/ Funding Date | TRE Auction # | Declared Seller according to TRE | Account Debtor | Product according to TRE | Face Value | Maturity |
|---|---|---|---|---|---|---|
| December 30, 2014 | 30530 | Cargill Inc/CFSI | Mercator | Bunker fuel for ships | $3,499,999,48 | April, 2015 |
| October 31, 2014 | 30410 | Cargill Inc/CFSI | Mercator | Bunker fuel for ships | $1,500,093.34 | April, 2015 |
| April 10, 2015 | 30711 | Cargill Inc/CFSI | Mercator | Bunker fuel for ships | $3,999,999.81 | September, 2015 |

43. The Bank purchased all three A/Rs and remitted the required payment to TRE, in aggregate, $8,854,120.80.  For auction no. 30530 the net payable to TRE was $3,455,430.82; for auction no. 30410 the net payable to TRE was $1,471,760.74; and for auction no. 30711 the net payable to TRE was $3,926,929.24.  Upon information and belief, TRE remitted these funds, less its charges and fees, to Cargill.

44. In April 2014, Mercator, citing difficulties facing the dry bulk shipping market, appointed a financial advisor "to assist with an assessment of its financial position and to advise

– 9 –

and assist, as appropriate, with the options available to the company with respect to its financial affairs". http://mllsg.listedcompany.com/newsroom/20150410_221502_EE6_M9K98XRYJ7HY7X8K.1.pdf (viewed October 1, 2015); *see also* http://infopub.sgx.com/FileOpen/Response%20to%20Query%20Regarding%20Trading%20Activity.ashx?App=Announcement&FileID=365353 (viewed October 1, 2015).

45. Subsequently, Mercator failed to pay the first two maturing A/Rs. Upon information and belief, Mercator is currently proposing to reschedule much of its debt, including that which is represented by the A/Rs.

46. On April 22, 2015, following Mercator's failure to pay the first maturing A/R, the Bank requested that TRE obtain and forward documentation respecting the commercial activity that ostensibly underlay the A/Rs. In short order, TRE provided disturbing information.

47. The documentation was not as described. Invoice numbers did not match; and the produced documentation described products that were fundamentally different from the products described in the information posted on TRE's website, presumably provided by Cargill. Thus rather than reflect the sale and purchase of "bunker," the underlying documentation concerned "naphtha" and "gasoil." Those differences are summarized in the following chart.

| TRE Auction # | Seller according to information defendants provided on TRE website at time of auction | Seller according to documents provided in May/June 2015 | Product according to information defendants provided in Info Mem via TRE at the time of initiating business with Cargill/Mercator | "True" Product according to documents provided in May/June 2015 | Invoice # according to information defendants provided on TRE website at time of auction | Invoice # according to information defendants provided in May/June 2015 |
|---|---|---|---|---|---|---|
| 30530 | Cargill Inc/CFSI | Invoiced by Cargill Financial Solutions, LLC to Mercator<br><br>Bill of lading indorsed by Cargill, Incorporated to Cargill International SA to Statoil ASA | Bunker fuel for ships | Gasoil | 97030 | CFSIL-611-15-S |
| 30410 | Cargill Inc/CFSI | Invoiced to Mercator by Cargill International SA Bill of lading indorsed by Cargill International SA to Cargill International Trading Pte Ltd. | Bunker fuel for ships | Naphtha | 95011 | 14000043 |

| TRE Auction # | Seller according to information defendants provided on TRE website at time of auction | Seller according to documents provided in May/June 2015 | Product according to information defendants provided in Info Mem via TRE at the time of initiating business with Cargill/Mercator | "True" Product according to documents provided in May/June 2015 | Invoice # according to information defendants provided on TRE website at time of auction | Invoice # according to information defendants provided in May/June 2015 |
|---|---|---|---|---|---|---|
| 30711 | Cargill Inc/CFSI | Invoiced by Cargill Financial Solutions, LLC to Mercator Bill of lading indorsed by Cargill International SA to Cargill International Trading Pte Ltd. | Bunker fuel for ships | Naphtha | 98911 | CFSIL-696-15-S |

48. As significant, Cargill later revealed that the A/Rs did not relate to bona fide sales to Mercator. Instead, the A/Rs were a front for a financing, a loan or loans made by some component of Cargill to Mercator.

49. In brief, affiliates of Cargill—but neither Cargill Inc. nor CFSI—notionally sold products to Mercator with deferred payment terms. Mercator's purchase, however, was conditioned on its simultaneous sale back to Cargill or other Cargill affiliates. Cargill, in turn, notionally provided Mercator with the funds with which to pay the original notional sellers, *i.e.*, Cargill's affiliates. Mercator, therefore, was doing little more than borrowing from one Cargill entity with a promise to repay another Cargill entity in the future. The goods were never sold to Mercator. Nothing was delivered to Mercator. Indeed, bills of lading were never indorsed to Mercator.

50. In sum, the documentation the Cargill ultimately provided demonstrates that the A/Rs relate to sham transactions, mere window dressing for a series of loans by Cargill or Cargill affiliates to Mercator rather than bona fide sales of goods. Indeed, the notional sales that the documentation reflects are not even that which Cargill describe via its auction posting.

51. The disparity between that which was described, represented and warranted and that which the Bank actually bought has caused the Bank to suffer real and continuing damages. For example, Mercator, apparently experiencing cash flow issues, is proposing to reschedule the debt that it owes to various creditors. As is often the case, Mercator proposes to provide trade creditors with favorable terms. But Mercator, fully aware of the actual facts, does not consider the A/Rs to represent trade debt, and proposes for them far less favorable terms.

52. Based on the foregoing, and as described in more detail below, the Bank, through TRE, demanded that Cargill repurchase the A/Rs. Cargill refused.

53. On July 10, 2015, the Bank commenced the above-captioned action against Cargill for breaches of the contractual representations and warranties it made as a seller of the A/Rs through TRE.

54. On August 24, 2015, Cargill filed its Third-Party Complaint against TRE for breach of contract, breach of the covenant of good faith and fair dealing, common law indemnification, and fraud.

55. Cargill alleges in its Third-Party Complaint that prior to making the A/Rs available for purchase, it disclosed to TRE the "series of transactions with Mercator that it would sell on TRE's exchange—i.e., accounts receivable whereby a Cargill entity would sell a commodity to Mercator under a deferred payment agreement, in connection with which another entity within the Cargill group would repurchase the commodity, paying on sight." *See* Cargill's

Third-Party Complaint at ¶ 8.  In other words, according to Cargill, TRE knew that the A/Rs did not reflect bona fide sales of goods, but merely were window dressing for a financing scheme.

56. For example, Cargill alleges that, in 2013, when it first proposed Mercator as a possible counterparty for which Cargill might post receivables for sale on TRE, Cargill explained to TRE the contemplated transactions with Mercator.  *See* Third-Party Complaint at ¶ 39.  On October 1, 2013, Cargill allegedly emailed two individuals at TRE, Jeff Kleinops and Bos Smith, about Mercator receivables, saying: Cargill will have trade-based A/Rs, most likely selling oil, fuel, or coal to [Mercator] on 180-day terms, however, in this situation Cargill would also be on the other side of the transaction, immediately repurchasing the commodity, paying on sight, leaving the company with funding for 180 days, but not actually using the asset they purchase."  Third-Party Complaint at ¶ 39.

57. Cargill alleges also that, on October 29, 2013, Cargill sent an email to TRE, asking TRE to communicate the nature of the Mercator transactions to buyers.  *See* Third-Party Complaint at ¶ 41.

58. Cargill alleges also that in an email dated January 2, 2014, Cargill wrote TRE that, with respect to Mercator receivables sold through TRE, Cargill would be selling coal and oil cargos to Mercator and that "[t]hese cargos may be used by Mercator, sold to a 3rd party, or resold to Cargill for the purpose of extending financing to Mercator."  Third-Party Complaint at ¶ 43.

59. TRE did not inform the Bank of information Cargill alleges to have provided to TRE, referenced in ¶¶ 56-58, above.

60. TRE therefore was aware of or grossly negligent in not knowing the nature of the transactions underlying the A/Rs when it solicited the Bank's purchase of the A/Rs.

61. When it solicited the Bank's purchase of the A/Rs, TRE intentionally omitted or was grossly negligent in not informing the Bank of the nature of the transactions underlying the A/Rs and that the A/Rs were materially non-compliant with the representations and warranties in the Seller Agreement.

62. TRE made these material omissions in order to induce the Bank to purchase the A/Rs.

63. Had TRE communicated that the true nature of the transactions underlying the A/Rs, the Bank would not have purchased the A/Rs.

First Claim for Relief (Breach of the Covenant of Good Faith and Fair Dealing)

64. The Bank repeats and re-alleges each of the above averments.

65. By permitting Cargill to sell the A/Rs on TRE's website without reference to information Cargill had provided respecting lending activities, TRE effectively destroyed the Bank's right to the benefits of the Seller Agreement of which it was a Third-Party beneficiary, namely Cargill's representations and warranties that the A/Rs represented Cargill's bona fide sales of specified goods to Mercator, upon failure of which the Bank would be entitled to rescind its purchase.

66. By reason to the foregoing, the Bank has been damaged.

Second Claim for Relief (Breach of Contract)

67. The Bank repeats and re-alleges each of the above averments.

68. TRE's failure to inform the Bank of the true nature of the activity from which the A/Rs arose or to inform the Bank of information that Cargill provided respecting its financing activity was caused by TRE's gross negligence, bad faith, fraud or willful conduct in connection with the performance of its contractual duties, including those as Platform Administrator.

69. By reason of the above, TRE breached the terms of Buyer Agreement.

70. By reason of the above, the Bank has been damaged.

<u>Third Claim for Relief (Fraud)</u>

71. The Bank repeats and re-alleges each of the above averments.

72. TRE's purchases of the A/Rs were predicated on number of facts, including the representations and warranties in the Seller Agreement that:

- Each A/R arose out of "a bona fide, arm's length sale of goods or services in the ordinary course of [Cargill's] business, and [Mercator] has accepted the goods or services billed under the related Invoice without condition and without reservation of rights..." (Seller Agreement at section 10.1.5);

- Each A/R "does not relate from a conditional sale, delivery in bailment (or similar circumstances not involving sales)...." (Seller Agreement at section 10.1.6); and

- To Seller's knowledge, the Account Debtor information that Seller Posted on the Exchange with respect to the Auction for such Receivable is complete and accurate in all material respects" (Seller Agreement at 10.1.12).

73. TRE's purchases of the A/Rs were further predicated on the representations and warranties in the Cargill Program Summary that:

- The Sellers under the Cargill Program are Cargill, Incorporated and Cargill Financial Services International, Inc., a wholly owned subsidiary of Cargill, Incorporated. The Receivables to be sold by each Seller under the Program are Receivables originated by such Seller. Neither Seller has any liability with respect to Receivables sold by the other Seller.

    This summary overview of the Cargill Program is qualified in its entirety by the applicable terms of the Seller Agreement and other documents posted in the Legal Documents section. Buyers should be familiar with the terms of such documents before they submit any bids to purchase Receivables under the Program. (Cargill Program Summary)

74. TRE, via its website, made or delivered each of these representations to the Bank, intending that the Bank rely thereon.

75. Each representation was made of a material fact.

76. Each representation was untrue.

77. TRE knew each representation was untrue or recklessly disregarded the truth or falsity of the representations when made.

78. The representations were made with the intent to deceive and for the purpose of inducing the Bank to act upon them.

79. The Bank justifiably relied on the representations.

80. As a result, the Bank has been damaged.

WHEREFORE, ICICI Bank UK plc demands judgment against TRE as follows:

    A. As to all claims for relief, damages against TRE in an amount to be determined by the Court;

    B. As to its third claim for relief, punitive damages in an amount to be determined by the Court; and

    C. As to all claims for relief, interest at the statutory rate provided by the laws of the State of New York, plus costs, and to the extent permitted by law or contract, attorney fees and related legal expenses, as well as such other and further relief as the Court may deem just and proper.

Dated: New York, New York
       October 5, 2015

SULLIVAN & WORCESTER LLP

By: /s/Michael T. Sullivan
    Michael T. Sullivan
    Clark A. Freeman
    1633 Broadway, 32nd Floor
    New York, New York 10019
    (212) 660-3000
    msullivan@sandw.com

*Attorneys for ICICI Bank UK plc*